UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| MATT UTECHT and KENT DIXON, as Trustees of the Minneapolis Retail Meat Cutters and Food Handlers Health and Welfare Fund,<br><br>Plaintiffs,<br><br>v.<br><br>SUPERVALU, INC.,<br><br>Defendant. | Case No. 20-CV-976 (NEB/TNL)<br><br>ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |

This matter comes before the Court on cross-motions for summary judgment. At issue is the Fund's[1] and SuperValu's interpretation of a collective bargaining agreement. Specifically, the parties disagree about SuperValu's required Fund contributions. For the reasons below, the Court denies both motions.

BACKGROUND

I.   The CBA

The Fund, represented by trustees Matt Utecht and Kent Dixon, is a multi-employer benefit plan under the Employee Retirement Income Security Act ("ERISA"). (ECF No. 26 ¶ 1.) SuperValu is a party to the collective bargaining agreement ("CBA")[2]

---

[1] The Court will refer to the Minneapolis Retail Meat Cutters and Food Handlers Health and Welfare Fund as the "Fund."

[2] The CBA is called the Cub Foods Corporate Agreement. (ECF No. 60 ("Sobotka Decl.") ¶ 4.) It was negotiated by the Minneapolis Grocery Retailers (the "employers"), of which

and is therefore required to pay certain amounts into the Fund. (Sobotka Decl. ¶ 4; *id.*, Ex. 1 (the "CBA") art. 15(A).) The contribution amounts are based on the number of SuperValu full-time ("FT") and part-time ("PT") employees[3] receiving benefits from the Fund. (CBA art. 15(A).)

The Fund was created "in lieu of all Employer established programs including life insurance, sickness and accident insurance, hospitalization insurance, or any other said forms of insurance." (*Id.*) This case centers on the interpretation of the CBA's Article 15. Article 15 sets forth the contributions that employers, including SuperValu, are to pay into the fund. Article 15(A) addresses contributions on behalf of two types of employees:

---

SuperValu is a part of, and the UFCW Union Local 653 (the "Union"). (ECF No. 70 ("Bryant Decl."), Ex. 28 (filed under seal) at 2.) The lead Union negotiator for the CBA at issue was Fund trustee Matt Utecht. (Bryant Decl., Ex. 3 ("Seehafer Decl.") ¶ 9.) Although the employers negotiated as a group, each employer would ultimately execute its own CBA. (*Id.* ¶¶ 6–7.)

[3] The CBA provides for four categories of PT employees. (CBA art. 2.5(B)–(E).) Modified part-time ("MPT") employees are scheduled to work 15 to 31.9 hours per week in no more than five days Monday–Saturday. (*Id.* art. 2.5(A).) Regular part-time ("RPT") employees are scheduled to work 15 to 29.9 hours per week in no more than five days Monday–Saturday. (*Id.* art. 2.5(B).) Group 3 part-time employees are scheduled to work 15 to 28 hours per week in no more than six days Monday–Sunday. (*Id.* art. 2.5(C).) Part-time courtesy and custodial employees are to be paid a minimum of four hours at the prescribed rate when scheduled or called to work. (*Id.* art. 2.5(E).)

SuperValu must keep PT employees distinct from FT employees. For example, under the CBA, FT employees can do any duty in any department, but PT employees are restricted from doing certain types of work. (*Id.* art. 5.8(A)–(B).) And FT employees are entitled to a higher wage. (*Id.* app. C.) SuperValu may temporarily advance a PT employee to FT "status" but only after the employee signs a waiver guaranteeing them a FT wage during the waiver period but restricting their access to FT benefits. (*Id.* art. 23.1.)

employees who work 32 hours or more and employees who work less than 32 hours. In full, Article 15(A) provides:

> The Employer agrees to pay into the [] Fund contributions on behalf of any employee who has worked thirty-two (32) or more hours (full-time), exclusive of hours worked on Sundays and holidays, except for floating and banked holidays. The Employer further agrees to pay into the [] Fund contributions on behalf of any employee (excluding Courtesy, Custodial and Group 3 part-time employees) working less than thirty-two (32) hours per week (part-time) exclusive of hours worked and/or paid for on Sundays and holidays. Such Trust Fund is jointly administered, is a part of this Agreement, and is in lieu of all Employer established programs including life insurance, sickness and accident insurance, hospitalization insurance, or any other said forms of insurance now in practice.

(*Id.*)

Article 15(C) then addresses the amount, or schedule, of contributions. It reads:

> The Schedule of contributions is as follows:
>
> Employers: March 6, 2016 through March 4, 2017:
>
> > Full-time Employees: $159.80 per week
> > Modified and Regular Part-time Employees: $56.90 per week
>
> Effective March 5, 2017 employer contributions will be made on behalf of "covered" employees in the health care plan:
>
> > Full-time Employees: $210.65 per week
> > Modified and Regular Part-time Employees: $116.89 per week
>
> Employees will be required to make contributions to their Health & Welfare as follows:
>
> > Full-time: $10.00 per week
> > Modified part-time: $5.00 per week

> The Employer will collect the employee contributions which will offset the Employer contributions. The Employer will implement a pre-tax plan for employee contributions. In the event that an employee should "opt out" of coverage, then there will be no employer nor employee contribution due on their behalf.

(*Id.* art. 15(C).)

The current CBA was the result of recent negotiations (the "2016 negotiations"). (ECF No. 61, Ex. 1 ("Crandall Dep.") at 36–37.) Under the prior CBA, employers contributed to the Fund based on its number of MPT employees *and* RPT employees even though RPT employees were ineligible to receive Fund benefits.[4] (Bryant Decl., Ex. 17 at 46.) This system "led to significant erosion of the fund's assets and ability to pay benefits." (*Id.* at 45.) Because of this glitch, during the 2016 negotiations, the Union and employers changed to a "true cost" funding mechanism, which involved an actuary giving a "ballpark estimate of what the benefits truly would cost for a full-timer and a modified part-timer"—*i.e.*, those eligible to receive Fund benefits. (*Id.*)

Under the true cost model, "if an employer wants to cover someone, they pay the true cost" of the coverage. (Bryant Decl., Ex. 1, at 65.) To this end, when the actuary did

---

[4] It is for this reason that the CBA's employer contribution schedule is divided into two separate timeframes: (1) March 6, 2016, through March 4, 2017, and (2) after March 5, 2017. (CBA art. 15(C).) Before March 5, 2017, the employers contributed to the Fund based on the old system—not the "true cost" funding mechanism. (Crandall Dep. at 162–63 (explaining the changes made to the CBA affecting the March 5, 2017 transition).)

4

his projections, he only assumed employer contributions were made for employees who were eligible for the health plan. (Bryant Decl., Ex. 15, at 64.)

After negotiations, the Union agreed to the employers' final true cost proposal, which expressly stated that "Effective March 5, 2017, the Employer will only contribute on behalf of 'covered' employees in the Health care plan (**Full-time and Modified PT**)." (ECF No. 73-1 ("Employer Final Offer") (filed under seal) at 1 (emphasis in original); *see* Seehafer Decl. ¶¶ 16, 19.) "Employees can 'opt out' of coverage and, if they do, no employer nor employee contribution will be due." (Employer Final Offer at 1.) The final proposal also provided that employer contributions would be $210.65 per week for FT employees and $116.89 per week for "**Modified PT**" employees. (*Id.* (emphasis in original).) Following the employers' final proposal, the "Unanimously Recommended Proposal for Ratification"[5] provided that:

> Effective March 5, 2017:
> The employer will continue to make contributions on behalf of all full-time and modified part-time employees at the following schedule.
> **"True cost" The new contribution rates listed below reflect the "actual" cost of the benefit package.**
> . . .
> **As you can see the cost to the employer is substantial.**
> Employer Contributions (effective March 5, 2017):
> - Full-time: old rate: $159.80 / week, new rate: $210.65 / week
> - Modified part-time: old rate: $59.90 / week, new rate $116.89 / week

---

[5] The proposal neglected to include the "opt out" language, but the Union agreed to include it in the final version. (Bryant Decl., Ex. 30 (filed under seal) at 1.)

(Bryant Decl., Ex. 28 (filed under seal) at 1 (emphasis in original).)

The Union and the employers revised most of the CBA to include the negotiated proposal. (Seehafer Decl. ¶ 19.) But they missed Article C: although they deleted the reference to "regular part-time employees" from the CBA's Article 15(I) and (J), the Union and the employer failed to remove the reference from Article 15(C). (*Id.*) In the next round of negotiations for the newest CBA, the parties noted the error. (*Id.* ¶ 20; Bryant Decl., Ex. 8 (filed under seal) at 2.)

## II.   The Audit

To ensure that employers correctly contribute to the Fund, employers must produce employment and payroll records to the Fund's representatives on request. (Sobotka Decl. ¶ 7.) In February 2019, the Fund's auditor, Timothy Sobotka, reviewed SuperValu's records. (*Id.* ¶¶ 2, 8, 10.) Sobotka identified contributions due for certain employees who worked over thirty-two hours in certain weeks but "for whom SuperValu had not reported nor paid benefits into the Fund . . ." (*Id.* ¶ 10.) The Fund issued SuperValu an invoice for $132,883.94 for contributions owed between January 2016 and December 2017, and SuperValu remitted a partial payment. (*Id.* ¶ 15.) SuperValu claims that the remaining amount reflects hours RPT employees worked, and so it was not obligated to contribute to the Fund on their behalf. (*Id.* ¶ 14.)

### III. Procedural History

The Fund sued SuperValu and United Natural Foods, Inc. under ERISA Sections 515 and 502(g) seeking the unpaid benefit contributions. (ECF No. 1.) The Fund also sought interest on the unpaid contribution amounts, liquidated damages, costs, and attorney's fees. (*Id.*) United Natural Foods was dismissed from this action following a consent motion for dismissal. (ECF No. 55.) Now before the Court are cross-motions for summary judgment on whether SuperValu must contribute to the Fund when RPT employees work thirty-two hours or more in a week. (ECF Nos. 56, 63.)

## ANALYSIS

### I. Legal Standard

*Summary judgment.* "Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012) (citing Fed. R. Civ. P. 56(c)(2)). A dispute of fact is "genuine" if a factfinder could reasonably determine the issue in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On cross-motions for summary judgment, the Court views the record in the light most favorable to the plaintiff when considering the defendant's motion and the record in the light most favorable to the defendant when considering the plaintiff's motion. *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012). "Where the record taken as a

whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and citation omitted).

*Contract interpretation.* Whether the CBA is ambiguous is a question of law. *Cent. States, Se. & Sw. Areas Pension Fund v. Indep. Fruit & Produce Co.*, 919 F.2d 1343, 1350 (8th Cir. 1990). And the question of how to interpret an ambiguous term in the CBA will be a question for the trier of fact. *McKenzie Eng'g Co. v. N.L.R.B.*, 182 F.3d 622, 626 (8th Cir. 1999) ("[W]here, as here, the terms of a collective bargaining agreement are ambiguous, questions of its interpretation must be resolved by the trier of fact, and we will accord deference to that interpretation.").

## II.     Section 515 Contribution Requirements

The Fund argues that SuperValu violated Section 515 of ERISA, 29 U.S.C. § 1145, by neglecting to contribute to the Fund when RPT employees worked thirty-two hours or more. Section 515 governs claims for the nonpayment of fund contributions.[6] The Fund may initiate a civil action in federal court to enforce the mandates of Section 515 and collect damages. *Midwest Constr. & Distrib. Indus. Benefit Tr. v. Ferguson Enters., Inc.*,

---

[6] Section 515 states:
> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.

8

No. 14-CV-853 (ADM/HB), 2015 WL 4255785, at *5 (D. Minn. July 14, 2015) (citing *Bituminous Coal Operators' Ass'n v. Connors*, 867 F.2d 625, 633 (D.C. Cir. 1989)). Section 515 places the Fund in a "better position than that which it would otherwise occupy in relation to the collective bargaining agreement." *Indep. Fruit & Produce*, 919 F.2d at 1348. Thus, the Fund is "entitled to enforce the writing without regard to understandings or defenses applicable to the original parties." *Id.* (citation omitted). "If it means nothing else, section 515 means that suit by a trustee cannot be thwarted by defenses not apparent from the face of the Agreement." *Id.* at 1349 (cleaned up, citation omitted). Although Section 515 disallows contract formation defenses, SuperValu may still argue that the CBA does not obligate it to contribute to the Fund for RPT employees. *Carpenters Fringe Benefit Funds of Ill. v. McKenzie Eng'g*, 217 F.3d 578, 582 (8th Cir. 2000) ("Under ERISA § 515, the Funds may collect only those contributions that [the employer] is contractually obligated to pay.")

### III.   Ambiguity

*The standard.* What the Union and the employers believed when writing the CBA is irrelevant if the CBA unambiguously expresses something other than what was intended. *Indep. Fruit & Produce*, 919 F.2d at 1349. The Court will consider the CBA ambiguous "only if it is reasonably susceptible of more than one construction."[7] *Id.* at

---

[7] In deciding if the CBA is "reasonably susceptible of more than one construction, words are to be given their plain and ordinary meaning as understood by a reasonable, average person." *Indep. Fruit & Produce*, 919 F.2d at 1350.

1350. When interpreting the CBA, the Court applies federal common law rules of contract interpretation. *Harris v. The Epoch Grp., L.C.*, 357 F.3d 822, 825 (8th Cir. 2004). And the Court must "construe the contract as a whole" and "read the terms of the agreement in their context." *Sara Lee Bakery*, 746 F.3d at 346 (quotation marks and citations omitted). "[U]nder federal common law, a contract should be interpreted as to give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous." *Harris*, 357 F.3d at 825 (quotation marks and citation omitted).

Typically, if a CBA is unambiguous, it is determined by its four corners—"from the contract's contents." *Sara Lee Bakery*, 746 F.3d at 347 (quotation marks and citations omitted). In other words, the Court cannot consider extrinsic evidence to demonstrate an inconsistency or to show "that the parties intended to make an agreement which is inconsistent with the unambiguous words of their written contract." *Id*. (citation omitted). On the other hand, if a contract is ambiguous, extrinsic evidence may be consulted to aid the factfinder in its interpretation. *CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 765 (2018); *Sara Lee Bakery*, 746 F.3d at 347 ("Only upon a finding of ambiguity does the agreement's meaning become a question of fact for the jury, at which point extrinsic evidence becomes an aid in its interpretation.").

*The CBA.* The CBA is ambiguous. The Fund contends that Article 15(A) unambiguously requires SuperValu to contribute to the Fund based on the number of

hours worked by its employees—regardless of their employee classification—because Article 15(A) requires contributions for "*any* employee who has worked thirty-two (32) or more hours (full-time)." (CBA art. 15(A) (emphasis added).) SuperValu counters that Article 15(A) cannot be read in isolation and must be reconciled with Article 15(C)'s reference to "covered." It also argues the Fund's interpretation is illogical: no one expects employer contributions for a RPT employee working *under* thirty-two hours in a week even though Article 15(A) states "*any* employee."[8] *Id.*

SuperValu contends that the CBA is only ambiguous because Section 15(C) erroneously includes "Regular Part-time" in the post-March 5, 2017 contribution amounts. The parties agree that this inclusion of "Regular Part-time" was an error. And SuperValu insists that excluding this scrivener's error would eliminate ambiguity.[9] (ECF

---

[8] The particular Article 15(A) language at issue is: "The Employer further agrees to pay into the [Fund] contributions on behalf of *any* employee . . . working less than thirty-two (32) hours per week (part-time)." (CBA art. 15(A) (emphasis added).)

The Fund agrees no contribution is required for RPT employees working under thirty-two hours per week. But it is notable that during the 2016 negotiations, employers proposed eliminating their requirement to contribute a FT rate for PT employees working thirty-two or more hours per week (*i.e.*, employers pay a FT rate, instead of a PT rate, when a PT employee works over 32 hours in a week), and the Union rejected this proposal.

[9] A scrivener's error "occurs when the intention of the parties is identical at the time of the transaction but the written agreement does not express that intention because of that error; this permits a court acting in equity to reform an agreement." *Cross v. Bragg*, 329 F. App'x 443, 454 (4th Cir. 2009) (quotation marks and citation omitted); *see also Hubbard v. PNC Bank Nat. Assoc.*, No. 13-CV-337 (MJD/JSM), 2013 WL 4781023, at *12 (D. Minn. Sept. 5, 2013). "[T]he power to recognize and correct a scrivener's error in an ERISA plan

11

No. 82 at 37–38.) SuperValu claims Article 15(A), read in conjunction with Article 15(C), clearly provides employers only owe contributions for "covered" employees—meaning FT and MPT employees receiving health benefits. SuperValu's argument relies on the 2016 negotiation documents, the Fund's notices following the negotiated CBA, and other extrinsic evidence that a factfinder can examine when resolving the CBA's ambiguity.

The Court agrees with the parties that their respective interpretations of the CBA are each reasonable. But the Court disagrees with the Fund that Article 15(A) alone resolves the CBA's ambiguity. And the Court disagrees with SuperValu that without the scrivener's error, Article 15 becomes clear. A factfinder could reasonably read Article 15 to define a FT employee, for purposes of health benefits, as *anyone* who works more than thirty-two hours (*i.e.*, the Fund's position). And a factfinder could equally reasonably read Article 15 to require employer contributions only for "covered" employees— meaning FT and MPT employees who have not opted out of benefits (*i.e.*, SuperValu's position). Because both interpretations are reasonable, Article 15 is ambiguous.

It is also unclear if "(full-time)" and "(part-time)" in Article 15(A) refer to the CBA's internal classifications[10] (SuperValu's argument) or are themselves defining terms

---

rests exclusively with the courts." *Cross*, 329 F. App'x at 454; *see also Cent. Valley Ag Coop. v. Leonard*, 986 F.3d 1082, 1088 (8th Cir. 2021) (correcting a CBA's scrivener's error because the error was "apparent when the communications between the parties and the performance of the contract are examined.").

[10] The CBA allows an employer to classify an employee as "full-time" or one of the four types of "part-time." (CBA arts. 2.1, 2.5.)

for Article 15(C) (the Fund's argument).[11] Alternatively, Article 15(A)'s parenthetical language could refer to 15(C)'s contribution amount—*i.e.*, if a MPT employee works at least thirty-two hours a week, the employer must contribute a "full-time" rate as defined by 15(C) instead of a "part-time" rate. Or, as SuperValu argues, "(full-time)" and "(part-time)" might not be classifications but are "general reference[s]" to hours worked that week.[12] (ECF No. 82 at 32.). These reasonable interpretations of "(full-time)" and "(part-time)" further demonstrate the CBA's ambiguity.

The Fund contends Article 15 is consistent with the CBA's other provisions that FT employees are those who work at least thirty-two hours per week. The record, though, does not support this contention. The Fund, for example, cites Article 17.2 to say FT employees are defined as "those 'regularly scheduled to work forty (40) hours or more per week **and those employees who have voluntarily agreed to work thirty-two (32) hours per week.**'" (ECF No. 62 at 21 (emphasis added by the Fund).) Article 17.2, though,

---

[11] Although Article 15(A) could be defining FT and PT employees to determine an employer's Fund contributions, it likely is not a complete definition. Article 15(C), for example, makes clear no contributions are required for employees who "opt-out," but Article 15(A) does not carve out this exception. (CBA art. 15(C).) The Fund argues Article 15(A) being incomplete does not make it a "general introductory clause." (ECF No. 84 at 21.) Instead, the Fund contends Article 15(A) must be read in conjunction with the "carve-outs" for which the CBA explicitly provides. (*Id.* at 21–22.)

[12] The Fund notes that Article 15 uses the language "has worked" instead of the language from other articles where an employee is "scheduled" to work, suggesting that an employee actually working thirty-two hours per week changes their classification for Article 15. (ECF No. 84. at 19–20.)

13

refers to employees internally classified as FT who have agreed to decrease their hours to thirty-two hours per week—not PT employees who work over thirty-two hours per week.[13]

Standing alone, it is also unclear what "covered"[14] means in Article 15(C) because it is not defined anywhere in the CBA. The Fund argues that "covered" defines the items that follow in 15(C)—*i.e.*, FT, MPT, and RPT employees. The Fund's interpretation of "covered" lacks merit because the Union and employers changed the contract language following the 2016 negotiations to include the word "covered" but included the same employee classifications.[15] "No terms [in the CBA] should be meaningless." *Sara Lee Bakery*, 746 F.3d at 346; *see also Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 744 (7th Cir. 1996). Section 15(C)'s reference to "covered," though, cannot be interpreted on the CBA's face, and so it is ambiguous. *See Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*, 846 F.

---

[13] The relevant text of article 17.2 is "**Full-Time Employees:** Those employees who are regularly scheduled to work forty (40) hours or more per week and those employees who have voluntarily agreed to work thirty-two (32) hours per week as set forth in Paragraph F below, or who have been involuntarily reduced to thirty-two (32) hours per week." (CBA art. 17.2 (emphasis in original).) Paragraph F provides the process for employers to reduce Group 1 (*i.e.,* FT employees) to thirty-two hours a week. (CBA art. 17.2(F).)

[14] "Covered" is in quotation marks in Article 15(C), bolstering the argument that this term is ambiguous.

[15] The Court agrees with SuperValu on this point. (ECF No. 82 at 29 ("Nor was that term in quotes used in Article 15 in the prior CBA which contained the same three classifications . . . . 'Covered' in quotes must be given meaning, and it is illogical to pretend that the parties put in a new, unnecessary, irrelevant term in quotes for nothing.").)

App'x 332, 341 (6th Cir. 2021) ("If a contract employs a critical term which is not defined, that term may generate an ambiguity. . . .") (quotation marks and citation omitted). SuperValu insists extrinsic evidence will resolve the ambiguity of "covered." And although this may be true, consulting extrinsic evidence will be a step taken by the factfinder.

The Court concludes the CBA is ambiguous, leaving for the factfinder the interpretation of Article 15. Because a reasonable jury could find for both SuperValu and the Fund after examining the extrinsic evidence, the Court must deny the motions for summary judgment.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Plaintiffs' Motion for Summary Judgment (ECF No. 56) is DENIED; and
2. Defendant's Motion for Summary Judgment (ECF No. 63) is DENIED.

Dated: June 9, 2022                                BY THE COURT:

                                                                               s/Nancy E. Brasel
                                                                               Nancy E. Brasel
                                                                               United States District Judge